Matter of D. M. (Norma M.) (2003 NY Slip Op 51490(U))

[*1]

Matter of D. M. (Norma M.)

2003 NY Slip Op 51490(U)

Decided on October 14, 2003

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 14, 2003

Family Court, Monroe County,
In the Matter of D.M., H.M., A.M., A.M., L.M. and N.M., 
 Children under the Age of Eighteen Years Alleged to be Neglected by
NORMA M., Respondents.
Docket No. N4369/4374-03

Peter Essley, Esq., Deputy County Attorney, for DHHS
Stephen Weisbeck, Esq., Law Guardian
Brian Wirley, Esq., Assistant Public Defender, for Respondent

MARILYN L. O'CONNOR, J.
Monroe County Department of Human and Health Services filed a petition under Article 10 of the Family Court Act on April 18, 2003 alleging that respondent had neglected the above-named six children, five boys and a girl, now ages 9 to 17. Respondent mother, who was alleged to have neglected these six children by failing to provide adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm by using a drug or drugs; by failing to provide the children with adequate education although financially able to do so or offered the financial means to do so; and for failing to provide adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm by other acts, conduct or behavior of a similarly serious nature requiring the aid of the court. The specific allegations of the petition supported all three claims.
At the time of the fact-finding hearing, the respondent's six youngest children were living with their older brother Charles. However, thereafter the court received a letter from Charles , which the court read with the consent of all the parties and their attorneys. The letter indicates he no longer wishes to care for the children and wants them returned to their mother. He did not think she should be found guilty of neglect, but suggested she be required to attend parenting classes.
The court finds that the preponderance of the evidence establishes that the respondent has neglected the children in three ways alleged in the petition. First, she neglected them through repeated misuse of illegal drugs and allowing them to live in a home where drugs were routinely sold from the front porch. (Family Court Act, §§ 1012[f][i][B] and 1046[a][iii]). Second, she neglected the six children through the lack of care, supervision and food (Family Court Act, § 1012[f][i][A]). Additionally, the evidence established that the respondent was guilty of educational neglect by reason of her prolonged failure to re-enroll Durell in school after he was eligible to be enrolled, and by reason of the fact that the children, especially, Durell, Harvey and [*2]Andrew had far too many unexcused absences from school. (Family Court Act, § 1012[f][i][A]). The bases for finding the children to be neglected children are discussed further below and are based on two witnesses, Millie Key, a DHHS caseworker, and Amelia Peterson, a 5-year FACIT employee who had specialized for 20 years in family crisis work.
I. ILLEGAL DRUGS
The evidence established that the respondent allowed the children to live in an environment surrounded by illegal drug use and sales and created part of that environment by her own drug use.. The respondent admitted to Millie Key that she uses marijuana when the children go to sleep. The convenience of this carefully circumscribed admission strains credulity and suggests that the respondent may well also use illegal drugs before the children go to sleep. Indeed, according to Key, Harvey and Durell, the two oldest boys, said their respondent used crack cocaine. Durell was even able to describe the crack pipe his respondent used. Again according to Key, Durell said someone sold drugs from the front porch of their home. This was corroborated by the caseworker's own testimony that whenever she visited, someone would be on the porch and would leave as she approached, and by respondent's adult child, Sherita. Key reported that Sherita said she was very concerned for her siblings because the respondent uses drugs and drugs are sold on her porch. The NET Office employees told Key that the respondents house had numerous reports for drug sales and drug arrests. Key also reported that an Evelyn Brandon counselor said the respondent had not been attending counseling since November 2002 but should be. Peterson had met with her at Conifer.[FN1] Thus, it must be concluded that the children are neglected based on the respondent's use of drugs and the drug sales she routinely permits on her porch. (See, e.g., In re Synovia G., 163 AD2d 257, holding that proof that a caretaker repeatedly misuses a drug is prima facie evidence of neglect; In re Theresa J., 158 AD2d 364).

II. FAILURE TO PROVIDE ADEQUATE GUARDIANSHIP & SUPERVISION

A. Leaving children home alone According to Key, in November 2002, respondent left her children (ages 16, 14, 12, 11, 9 and 8) alone for a day before anyone went to stay with the children. The oldest child need special educational services and could hardly be considered a fit "babysitter" or be managed adequately by the 14-year-old. The children did not know where their mother was. There was no food in the house when the caseworker went to the home to investigate the situation, and the adult sibling Charles had to go to the store to get them food. This incident resulted in an indicated CPS report.
B. Threats to kill children
The respondent also neglected the children through her repeated bizarre threats to kill them. Respondent's threatening behavior, though apparently never acted upon, has to have been emotionally very destructive for her children. It may also have contributed to the children [*3]hurting each other in at least one incident.[FN2] Peterson testified that on January 20, 2003,[FN3] she was called to the respondent's house because Andrew, age 12 at the time, was outside banging on the door, trying to get in.[FN4] Respondent told Peterson that if she did not take the children, she would take her daughter and burn the house down a totally inappropriate and harmful statement. The children were present when this threat was made. Peterson said the respondent had threatened to beat the children to death again a totally inappropriate and harmful statement. Key also testified that on February 24, 2003 respondent called a caseworker and said she was going to kill her kids, and that she wanted Harvey and Durell removed or she would hurt them. As a consequence, Durell moved out and went to live with a cousin. Then the respondent threatened to hurt Harvey, the next oldest child. Although there was no evidence that the respondent herself actually engaged in violence against the children, she engaged in a very dangerous and damaging pattern of behavior with her threats, which pattern by itself could be deemed neglect.

C. Lack of ability to get help when needed
Demonstrating another kind of neglect, she never filed PINS petitions for preventive services on the older children though she was advised to do so and clearly needed help with them. Her excuses for not doing so were not credible e.g., she could not get to the appropriate office because of problems with her foot, and she was made to wait too long. If she cannot wait for something so important, she has priorities which indicate she is unable to care for her children adequately. Significantly, she was able to get around to do other things that she wanted to do, and there was a bus stop adjacent to her house. She would not use free bus tokens when offered to compensate for the alleged problem with her foot. This inattention to important matters constitutes passive neglect.

III. EDUCATIONAL NEGLECT
The evidence regarding educational neglect is serious. First and foremost, the evidence showed she failed to re-register Durell in school when that was required, and this failure kept him out of school for a significant time. This was irresponsible, particularly since he is a special education child who needs extra help not less. Furthermore, the evidence of respondent's inability to handle the responsibility of getting children to school was overwhelming. In the school year 2002-2003, respondent's children had total of 124 illegal absences and 53 suspensions, plus numerous tardies:

 [*4] Durrell (d/o/b 5/17/86) had 32 illegal absences, 14 tardies, and 5 suspensions (due to reasons not stated in school records). 
 Harvey (dob 5/12/88) had 27 illegal absences and 8 tardies and no suspensions. 
 Andrew (d/o/b 7/1/90) had 22 illegal absences, 31 tardies and 23 house suspensions (due to threats to harm student, disciplinary action, defiance of authority, fighting and trespassing). 
 Aaron (d/o/b 8/1/91) had 14 illegal absences, 2 tardies and 25 house suspensions (for assault on student, defiance of authority, fighting). 
 Linda (d/o/b 9/3/93) had 15 illegal absences, 1 tardy, and no suspensions. 
 Norman (d/ob 7/30/94) had 14 illegal absences, no tardies and no suspensions. 
These statistics indicate a household out of control with respect to the serious matter of childhood education. Such proof establishes a prima facie case of educational neglect. Cf. In re Ryan J., 255 AD2d 999, 1000, where educational neglect was found when a 13-year-old had 46 illegal school absences from October 25, 1996 to March 13, 1997, and had not attended school at all since January 31, 1997; see also Oneida County Dep't of Soc. Servs. v. Donna A. (In re Nicole A.), 305 AD2d 1039; Matter of Fatima A., 276 AD2d 791; In re Kyle T., 255 A.D.2d 945, app den 93 NY2d 801; Matter of Christa H., 127 AD2d 997).

IV. RESPONDENT MOTHER'S TESTIMONY
The respondent did testify on her own behalf but was completely unable to explain away any parts of the prima facie 
case of neglect established through the testimony of Key and Peterson. In many ways, her testimony was not credible. In other ways, it just made the case against her stronger.
Regarding leaving the children alone, she said she had left Charles in charge, by leaving Harvey, at age 14, the second oldest of the six children still at home, a note to contact Charles which she went into "rehab." She simply denied threatening to burn the house down and kill the children, though both DHHS witnesses had testified very credibly to her threats to that effect. She explained locking Andrew outside in Januarywas punishment for skipping school, and said Andrew calmed down and apologized. A parent should not lock his or her child outside in a Rochester winter for punishment. Thus, this testimony did nothing to demonstrate she can take care of her children adequately or safely.
One theme of respondent's testimony was to blame a lot of her short-comings on Durell. Durell was belligerent, she explained, which of course means she should have pursued the PINS petition vigorously, though she did not even get it filed. As offered by the DHHS witnesses, she explained the problem with her foot that supposedly helped prevent her from getting to the office to file the PINS petitions, claiming she is not to walk far or stand long. Why this meant she could not take a bus when it was in the interests of her children to do so she did not say. She testified she had seen Durell hit Harvey, causing him to need 15 stitches. This of course indicates she has a mother was dangerously unable to control the children in her own home. She noted Durell was classified as emotionally disturbed and had been in special education classes since kindergarten. Nonetheless, she admitted never having been to even one special education meeting for him. She also testified that Durell started telling the other children they did not have to do certain things because their father was not there. She explained that is when she started planning to get Durell out of the house. She also admitted the Durell had sold drugs. Her [*5]testimony on these points served to enhance the case against her rather than rebut it.
Regarding illegal drugs, she explained her own use of marijuana as being done to get her appetite back, after losing it from taking lots of pills. She said she only used it two to three times per month. This was not credible. She admitted having had a mental health arrest in the winter and said she went to Main Quest as she was overwhelmed. She claimed that though she entered a detox program there, she was not tested for illegal substances. This is highly unlikely. She also said she went to Evelyn Brandon "for drugs" but not because she had a problem. Instead, she said she went to get back on social services. In short, none of this testimony was credible.

She agreed her three older children had problems in school, and Andrew particularly, as if having three who were doing what she thought was alright cancelled out the huge problems she admitted she had with the three older children. In effect she again admitted facts leading irredeemably to a conclusion of educational neglect.
 In short, the respondent's testimony was wholly ineffective to rebut the 
prima facie case of neglect presented against her. As a result, the six children must be found to be neglected children and a dispositional hearing must be scheduled pursuant to section 1045 of the Family Court Act.
NOW THEREFORE, for the reasons set forth above, it is
FOUND that facts sufficient to sustain the petition are established and the children are neglected children (Family Court Act, § 1051[a]), whose physical, mental and emotional condition was in imminent danger of becoming impaired as a result of the failure of their mother Norma M. to exercise a minimum degree of care with respect to them (Family Court Act, § 1012[f][i]), and it is further
ORDERED that the dispositional hearing in this matter shall be held before this Court on October 30, 2003 at 2 PM.
DATED: October 14, 2003
Rochester, NY
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE

Decision Date: October 14, 2003
Footnotes

Footnote 1: The court will take judicial notice of the fact that Conifer is a residential treatment center for drug and alcohol addicted people and is commonly used by people from the Rochester area..

Footnote 2: Peterson testified that Durell, who had boxing training, had at one time punched Harvey so hard that he required stitches 

Footnote 3: The evidence also shows, according to Key, that on January 21, 2003 respondent called authorities to say she would burn the house down with the children in it. It is not clear whether this is a different incident from the one described by Peterson or the same incident described as occurring on two different days.

Footnote 4: Cf. In re Michael W. (123 AD2d 874, 875, app dsmd 69 NY2d 1036, mot to vacate den, 70 NY2d 723) where an 11 year old was repeatedly forced by his mother to remain outside of the family residence for extended intervals of time, including periods lasting several days, and neglect was found.